**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUL 1 7 2014

Clerk, U.S. District and
Bankruptcy Courts

|  |  |
|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
| JOHN DOE,<br>c/o<br>FRESHFIELDS BRUCKHAUS<br>DERINGER US LLP,<br>601 Lexington Avenue,<br>31st Floor,<br>New York, NY 10022, | COMPLAINT FOR WRIT OF MANDAMUS AND FOR ORDER COMPELLING AGENCY ACTION UNREASONABLY DELAYED<br><br>Civil Action No. _____ |
| Plaintiff, | Case: 1:14-cv-01231<br>Assigned To : Contreras, Rudolph<br>Assign. Date : 7/17/2014<br>Description: Admin. Agency Review |
| v. | |
| UNITED STATES DEPARTMENT OF STATE,<br>2201 C Street NW,<br>Room 4330,<br>Washington, DC 20037, | |
| and | |
| HON. JOHN F. KERRY;<br>c/o United States Department of State,<br>2201 C Street NW,<br>Room 4330,<br>Washington, DC 20037, | |
| and | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>3801 Nebraska Avenue NW,<br>Washington, DC 20016, | |
| and | |
| HON. JEH JOHNSON,<br>c/o Department of Homeland Security,<br>3801 Nebraska Avenue NW,<br>Washington, DC 20016, | |

1

3

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff, John Doe, by and through undersigned counsel, alleges as follows:

## I.     INTRODUCTION AND SUMMARY

1.     Plaintiff seeks relief from this Court that may mean the difference between life and death for him, his wife, and his two small children.

2.     Plaintiff is an Iraqi citizen currently residing in Baghdad, Iraq. He served as an interpreter for U.S. forces in Iraq from December 2004 to January 2009. During that time, Plaintiff risked his life alongside U.S. troops on hundreds of occasions. By helping American soldiers, Plaintiff placed himself, his wife, and his two small children in serious and constant danger.

3.     If Plaintiff's service to the United States were to become known in Iraq, he would very likely be killed by persons hostile to the United States and to Iraqis who assisted the United States during Operation Iraqi Freedom. These dangers have increased exponentially in recent months, as has the risk that his identity will become known to the wrong persons.

4.     Congress has recognized the special risks faced by Iraqis in Plaintiff's position. Accordingly, in 2007, Congress enacted the Refugee Crisis in Iraq Act of 2007 and created a Special Immigrant Visa (*SIV*) pursuant to Section 1244 of that Act to facilitate emigration to the United States of Iraqis whose employment by or on behalf of the United States has placed them in grave danger. *See* Refugee Crisis in Iraq Act (2007), 8 U.S.C. § 1157 note.

5.      Dissatisfied with Defendants' failure to implement the SIV program in a timely fashion and concerned by the extreme risks faced by Iraqis who aided the United States in Iraq, Congress passed subsequent legislation creating stricter timelines for Defendants' processing of Iraqi SIV applications and imposing related reporting requirements on Defendants.

6.      In December 2013, Congress passed legislation mandating an "Improved Application Process" for Iraqi SIVs. This law requires that the Departments of State, Homeland Security and Defense complete processing of each SIV application "*not later than 9 months* after the date on which an eligible alien submits all required materials." *See* 8 U.S.C. § 1157 note at § 1242(c)(1) (emphasis added); Pub. L. No. 113-66, div. A, title XII, § 1218, Dec. 26, 2013, 127 Stat. 910.

7.      Based on the danger that he and his family face on a daily basis, Plaintiff submitted all of the documents needed to obtain Chief of Mission Approval (*COM Approval*), the first step in his SIV Application (the *Application*), to the U.S. Embassy in Baghdad, Iraq on May 11, 2012.

8.      Within ten weeks, on July 26, 2012, the U.S. Embassy in Iraq granted Plaintiff COM Approval, formally finding that Plaintiff satisfies the statutory criteria for an Iraqi SIV in that he has "provided faithful and valuable service to the United States," and "has experienced or is experiencing an ongoing serious threat as a consequence of [his] employment by or on behalf of the United States Government."

9.      Less than three weeks later, Plaintiff submitted his complete visa Application to the United States Citizenship and Immigration Services (*USCIS*) on August 15, 2012. On August 22, 2012, Plaintiff's Application was "conditionally approved" by USCIS.

Plaintiff attended a visa interview at the U.S. Embassy in Baghdad on November 20, 2012, the final step in the completion of his Application.

10.    Despite Congress's instruction that Iraqi SIV applications be processed within nine months on account of the dangers faced by applicants for these visas, Plaintiff and his family have, as of the filing of this Complaint, been waiting in Iraq and in danger for 2 years and 2 months (as of the submission of Plaintiff's COM Approval papers) – nearly three times the period statutorily specified by Congress for processing Iraqi SIV applications. One year, 10 months and 27 days – or over two and a half times the specified period – have elapsed since Plaintiff submitted his SIV Application to USCIS.

11.    Defendants' failure to timely adjudicate Plaintiff's Application is unreasonable and unlawful, and leaves Plaintiff, his wife, and their two small children in mortal danger. This danger increases by the day as the security situation in Iraq deteriorates.

12.    As a result, Plaintiff has no choice but to seek relief from this Court compelling Defendants to adjudicate his Application.

## II.    JURISDICTION AND VENUE

13.    Jurisdiction is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. §§ 701-06 (Administrative Procedure Act).

14.    Venue is properly with this Court, pursuant to 28 U.S.C. § 1391(e), because the Defendants are federal agencies or officers of federal agencies, all of which are headquartered in the District of Columbia. Furthermore, a substantial part of the events or omissions giving rise to the Complaint necessarily occurred or failed to occur within the District of Columbia.

### III.    PARTIES

15.    Plaintiff John Doe is an Iraqi national presently residing in Baghdad, Iraq. Plaintiff served as an interpreter for United States forces in Iraq between 2004 and 2009, as a consequence of which his life is in grave danger.

16.    Defendant United States Department of State is an agency of the United States and shares responsibility with Defendant United States Department of Homeland Security (*DHS*) for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Act of 2007.

17.    Defendant the Honorable John F. Kerry is the Secretary of State and exercises authority over the Department of State. The Secretary of State, together with the Secretary of Homeland Security, is responsible for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007. Secretary Kerry is sued in his official capacity only.

18.    Defendant DHS is an agency of the United States and shares responsibility with Defendant Department of State for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007. USCIS is a component of DHS.

19.    Defendant the Honorable Jeh Johnson is the Secretary of Homeland Security. Defendant Johnson exercises authority over Defendant DHS. The Secretary of Homeland Security, together with the Secretary of State, is responsible for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007. Secretary Johnson is sued in his official capacity only.

## IV. STATEMENT OF FACTS

### A. PLAINTIFF'S BACKGROUND

20.     Plaintiff is an Iraqi citizen and a resident of Baghdad, Iraq. Plaintiff is agnostic, but of Shiite ethnicity. Plaintiff is married and has two small children. Plaintiff's wife, the mother of his children, is of Sunni ethnicity.

21.     On March 20, 2003, United States and allied forces entered Iraq as part of Operation Iraqi Freedom. As an Iraqi fluent in both Arabic and English, Plaintiff volunteered to assist the U.S. Army as a translator and interpreter. Plaintiff believed that this work would allow him to contribute to building a new Iraq, free of dictatorship and fear, and based on democracy, human rights, and the rule of law.

22.     In December 2004, Plaintiff began his service on behalf of the United States as an interpreter through the military contractor L-3 Communications. Plaintiff later worked through another contractor, Global Linguist Solutions. Plaintiff successfully underwent repeated and thorough security and background checks as a condition of his employment.

23.     Over the next four years, Plaintiff interpreted for U.S. troops and Iraqi soldiers and civilians, advised U.S. officers on their interaction with Iraq's diverse ethnic groups, and assisted in the training of Iraqi troops.

24.     Plaintiff shared the risks faced by the U.S. soldiers with whom he served. Plaintiff participated in some two hundred combat patrols. Plaintiff sustained heavy rocket bombardments and travelled in convoys that were ambushed and attacked with improvised explosive devices.

25.    The dangers Plaintiff faced were not limited to the battlefield. Plaintiff exposed both himself and his family to severe and likely reprisals from terrorists, should his work for the United States become known.

26.    Upon information and belief, more than 1,000 Iraqi interpreters working for the United States and allied forces have been killed in combat or assassinated since the start of Operation Iraqi Freedom.

27.    So great were the risks run by interpreters serving with U.S. troops that Plaintiff could tell no one but his immediate family about his work for the United States. That Plaintiff was serving as an interpreter for U.S. troops was a deadly secret that Plaintiff had no choice but to conceal from friends, neighbors, and extended family.

28.    On account of these dangers, Plaintiff was not able to work near his home in Baghdad, and instead was deployed to Kirkuk, in the north of Iraq, where he would not be so easily recognized.

29.    In early 2007, while Plaintiff was working as an interpreter for U.S. troops, Plaintiff narrowly escaped from a kidnapping attempt at a highway checkpoint in Iraq's Diyala Province operated by terrorists disguised as Iraqi military personnel. If the terrorists had found Plaintiff's interpreter's badge he would have been tortured and killed to send a message to other Iraqis willing to help the United States.

30.    Despite the constant danger, Plaintiff persevered, and earned the respect and admiration of the U.S. service members with whom he lived and served.

31.    For example:

(a)    In a letter to the U.S. Embassy dated March 20, 2012, U.S. Army 1st Lieutenant Roger Pohlman, who served with Plaintiff in Kirkuk, Iraq, wrote:

I personally selected [John Doe] to act as my personal interpreter when dealing with local tribal leaders and the Iraqi Army, his experience and understanding of the English language served me well in dealing with the Iraqi citizens. My directions to [John Doe] was [sic] to also alert me to cultural tensions that I may not pick up on, and [John Doe] readily did this, pointing out areas that we should pay closer attention to and also correctly interpreting inflection and tones of voice that aided my Platoon, and I believe, directly contributed to our ability to bring everyone home safely with NO major injuries . . . . [N]ow that American forces are out of Iraq, [John Doe] could become a target because of his service to American Forces during Operation Iraqi Freedom. . .

(b)     In a letter of recommendation dated September 27, 2008, U.S. Army 1st

Lieutenant Benjamin M. Feldman, who also served with Plaintiff in Kirkuk, wrote:

[John Doe] has served honorably and is a trusted member of my platoon. He is treated with the same respect and regard as any Soldier serving in my unit. I have personally worked with [John Doe] on a daily basis in and out of combat operations. I trust [John Doe] completely. [John Doe] has accompanied me and my platoon on every type of mission, whether it is a quick engagement with local Sheikhs or a multi-day air assault.

(c)     In a letter of recommendation dated June 11, 2008, U.S. Army Captain

David Grammier, who also served with Plaintiff in Kirkuk, wrote:

I have personally worked with [John Doe] on a daily basis in and out of combat operations. I trust [John Doe] completely. His loyalty has never been in question, his advice is constantly sought after by Soldiers, and his abilities are a combat multiplier. [John Doe] puts himself and his family at risk in order to support Coalition Forces and our mission. [John Doe] has done more for our country at war and for troops deployed in Iraq than most American citizens.

32.     When Plaintiff concluded his service with the U.S. Army in January 2009, he

believed that his young family would have a positive future in Iraq. Plaintiff accordingly

looked for a way to continue to advance the values that he believed in and that he

identified with the United States.

33.     Plaintiff has accordingly worked for Human Rights Watch (*HRW*), a U.S.-based

human rights organization, and numerous other human rights organizations as a translator

and consultant. As a researcher and translator for HRW, Plaintiff has investigated and exposed extrajudicial detention, torture, killings, secret prisons, and violence against peaceful protestors, as well as abuses of women and minorities in Iraq. Through his human rights work, Plaintiff has also helped coordinate the escape from Iraq of women fleeing "honor killings," as well as of LGBT individuals who face severe persecution in Iraq.

34.   Notwithstanding the efforts made to conceal the fact of his work for the United States, Plaintiff is in grave danger in Iraq, and lives under a constant threat of exposure and recognition. Plaintiff is at risk from terrorist groups and militias who are hostile to the Iraqi government.

35.   Plaintiff is also acutely concerned that individuals within the Iraqi government could deliberately leak information about his past service to the United States in order to retaliate against him for his human rights investigating and reporting.

36.   Plaintiff also faces the risk that records of his service to the United States could fall into the hands of Iranian security or intelligence officials now working closely with the Iraqi government.

37.   In addition to the dangers he faces, Plaintiff would have great difficulty finding other work in Iraq. It is not safe for Plaintiff to disclose his four years of service as an interpreter for U.S. forces to most employers in Iraq, or in other parts of the Middle East.

38.   Indeed, individuals who "collaborated" with U.S. forces are viewed with great suspicion, even hatred, throughout Iraq and the wider Middle East.

39.     Despite Plaintiff's work for a better Iraq and his loyal service to the United States, the security situation in Iraq has only worsened in recent years. The last U.S. troops deployed as part of Operation Iraqi Freedom were withdrawn in January of 2012.

40.     Since that time, Iraq has slipped into sectarian civil war, pitting Sunni extremists and factions from the Syrian civil war against an increasingly repressive Iraqi government dominated by Shiite factions and Iran.

41.     In this extremely violent environment, the prospects for Plaintiff and his family should they remain in Iraq are dire, given Plaintiff's past service to the United States. Upon information and belief, the danger to Plaintiff as a consequence of his service to the United States will only increase as the fighting in Iraq continues. Simply put, both an Iranian-dominated government and Sunni extremists would consider an individual with Plaintiff's background an enemy and a threat to be eliminated, should his identity be known.

## V.     THE IRAQI SPECIAL IMMIGRANT VISA PROGRAM

### A.     FRAMEWORK OF AN IRAQI SIV APPLICATION

42.     Concerned about the unique dangers faced by Iraqis who had helped the United States at risk to their own lives and those of their families, Congress enacted the Refugee Crisis in Iraq Act of 2007, Pub. L. 110–181, 122 Stat. 395 (Jan. 28, 2008) (the "Act"), as part of the 2008 National Defense Authorization Act to help individuals in Plaintiff's predicament. Under the Act, an SIV may be granted, subject to numerical limitations, to an applicant who:

(A)     is a citizen or national of Iraq;

    (B)    was or is employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year;

    (C)    provided faithful and valuable service to the United States Government, which is documented in a positive recommendation or evaluation . . . from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Iraq; and

    (D)    has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government.

8 U.S.C. § 1157 note at § 1244(b)(1). Spouses and children of those who meet these requirements may also receive derivative visas. *See id.* at § 1244(b)(2). The application process for an SIV pursuant to this statutory authorization has several stages.

43.    First, a petitioner must receive approval from the Chief of Mission (***COM***) in Iraq, who "conduct[s] a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section." *Id.* at § 1244(b)(4)(A).

44.    Second, having obtained "COM Approval," the applicant must submit an I-360 form to the USCIS Service Center, for forwarding to the National Visa Center, accompanied by all required supporting documents.

45.    Third, an applicant must undergo an interview at a U.S. consulate or embassy.

46.    Once these steps are completed, an application is ready for adjudication. If the visa is granted, the applicant is then resettled in the United States.

47.     Aware of the life-threatening delays faced by Iraqi SIV applicants, and dismayed by Defendants' failure to implement the program in a timely-fashion, Congress in 2013 amended the Refugee Crisis in Iraq Act to mandate an "Improved Application Process" for the Iraqi SIV program.

48.     The 2013 amendments require Defendants to complete processing of each SIV application "not later than 9 months after the date on which an eligible alien submits all required materials." *See* 8 U.S.C. § 1157 note at § 1242(c)(1).

49.     Congress underscored the importance of its specified nine month processing time by requiring Defendant Departments to report to Congress and to the public, within 120 days of the enactment of the 2013 amendments, and quarterly thereafter, detailing the number of SIV applications that had not been adjudicated within the nine month time period, the specific reasons for the failure to adjudicate those cases within that nine month time period, and the exact number of backlogged applications at each stage of the process. *See* 8 U.S.C. § 1157 note at §§ 1248(f), (g). Upon information and belief, although more than 120 days have passed since the enactment of the 2013 amendments, Defendants have failed to make these required reports.

50.     Congress further acknowledged the serious dangers faced by Iraqi SIV applicants by requiring the Department of State to make "a reasonable effort" to provide SIV applicants "with protection" while in Iraq, including "immediate removal from Iraq, if possible, of such alien if . . . such alien is in imminent danger." *See* 8 U.S.C. § 1157 note at § 1244(e). Upon information and belief, Defendants have failed to implement this statutory mandate to protect Iraqi SIV applicants. United States government protection for SIV applicants in Iraq is currently nonexistent.

B.    PLAINTIFF'S IRAQI SIV APPLICATION HISTORY

51.    Plaintiff submitted his Application for COM Approval to apply for an SIV on May 11, 2012.

52.    Plaintiff obtained COM Approval on July 26, 2012. Plaintiff's COM Approval was signed by Mary Eugenia Vargas, the Refugee Coordinator and designee of the Chief of Mission at the U.S. Embassy in Baghdad.

53.    In relevant part, the COM Approval recorded and confirmed the U.S. Embassy's formal findings that Plaintiff, consistent with the eligibility requirements for the Iraqi SIV Program, was (1) an Iraqi national who, (2) "ha[d] been employed by, or on behalf of the United States Government in Iraq, on or after March 20, 2003, for a period of not less than one year;" (3) "provided faithful and valuable service to the United States Government," and (4) "experienced or is experiencing an ongoing serious threat as a consequence of the employment by or on behalf of the United States Government."

54.    Based on these findings, the COM Approval determined that Plaintiff was "authorized to submit a petition for special immigrant status under Section 1244 of the 'Refugee Crisis in Iraq Act of 2007.'"

55.    Plaintiff submitted his Application to USCIS on August 15, 2012, and received conditional approval of his Application on August 22, 2012. On October 11, 2012, the Department of State's National Visa Center (*NVC*) informed Plaintiff that his NVC processing was complete.

56.    Plaintiff attended a visa interview at the U.S. Embassy in Baghdad on November 20, 2012. Since that time, Defendants have failed to adjudicate Plaintiff's SIV Application.

57.     Nearly two years have passed since Plaintiff filled his Application with USCIS and received "conditional approval" of that Application. More than one year and seven months have elapsed since Plaintiff's visa interview in November 2012.

58.     It has been two years and two months since Plaintiff first began the SIV process on May 11, 2012 by seeking COM Approval from the U.S. Embassy in Baghdad.

59.     Despite inquiries by Plaintiff's counsel and others, Defendants have failed to adjudicate Plaintiff's SIV Application, to indicate a date by which they will do so, or to explain their failure to act.

60.     Plaintiff has been diligent in pursuing his Application and in attempting to end Defendants' delay, but to no avail. For example:

        a.      On November 23, 2012, Plaintiff, acting through volunteer counsel provided by IRAP, contacted the Immigrant Visa Unit at the U.S. Embassy in Baghdad to inquire as to an estimated timeline for the adjudication of Plaintiff's Application. Counsel was advised that the Department of State "cannot predict how long this administrative review will take."

        b.      In April 2013, the office of Congressman Earl Blumenauer of Oregon, acting at the request of Plaintiff's counsel, made inquiries into the status of Plaintiff's SIV Application. Congressman Blumenauer's office was advised that Plaintiff's Application was undergoing "administrative processing [that] often lasts about 90 days."

        c.      On December 2, 2013, Plaintiff's counsel submitted an inquiry through the Department of State's online "LegalNet" service. On December 6, 2013, the Department of State advised that Plaintiff's case remained in "administrative processing."

d.      In April 2014, repeated contacts with the Department of State made by Rep. Blumenauer's office on Plaintiff's behalf yielded no concrete results, with State Department officials merely acknowledging that Plaintiff's Application remains pending.

61.     Plaintiff's Application continues to languish in "administrative processing," months after its submission in full and long past the expiration of the time frame set by Congress for processing Iraqi SIV petitions.

## VI.     THE DETERIORATING SECURITY SITUATION IN IRAQ PLACES PLAINTIFF IN INCREASED DANGER

62.     The State Department's COM Approval finding that Plaintiff met the statutory criteria set forth in the Act in that he "experienced or is experiencing an ongoing serious threat as a consequence of [his] employment by or on behalf of the United States Government" was made on July 26, 2012.

63.     Since that time, the security situation in Iraq has worsened dramatically. U.S. forces have almost completely withdrawn from the country and provide Plaintiff with no protection. A radical Sunni terrorist organization styling itself the Islamic State of Iraq and Syria (*ISIS*) has dragged the ongoing Syrian Civil War into Iraq. ISIS, a former affiliate of al-Qaida, has overrun Iraqi government positions across the north and west of Iraq, capturing dozens of cities and towns, and currently threatens Baghdad itself. Thousands – reportedly as many as a third – of Iraqi troops have deserted their posts.

64.     ISIS has engaged in massive atrocities against Iraqi soldiers and civilians and declared a new radical Islamic "caliphate" in northern Iraq, while openly seeking to foment a sectarian civil war with Iraq's Shiite population.

65.     At the same time, the Iraqi government has been increasingly open about its ever-heavier dependence on Iran for military and intelligence support, while growing daily more sectarian and authoritarian.

66.     The prospects for Plaintiff, who served alongside U.S. troops for four years, are accordingly extremely bad if he stays in Iraq. Simply put, Plaintiff is, upon information and belief, under a far greater "serious threat as a consequence of [his] employment by or on behalf of the United States" than when he first received COM Approval from the U.S. Embassy in Baghdad more than two years ago.

67.     The United States has extended the promise of an SIV available to Iraqis who, like Plaintiff, placed their lives at serious risk to serve U.S. troops in combat. Having made great sacrifices and run great risks for the United States, Plaintiff lives under a serious threat that is the consequence of his service to the United States. Plaintiff now asks no more than that the Government to which he gave "faithful and valuable" service act on his SIV petition.

## VII.   CLAIMS FOR RELIEF

### Count 1

**(28 U.S.C. § 1361, Mandamus to compel officers and agencies of the United States to perform a duty owed to Plaintiff, against all Defendants)**

68.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

69.     The Refugee Crisis in Iraq Act of 2007 imposes a mandatory and non-discretionary duty on Defendants to adjudicate Plaintiff's SIV Application; the

Administrative Procedure Act (*APA*), 5 U.S.C. § 555(b) obliges Defendants to do so within a reasonable time.

70.     The question of whether agency delay is "unreasonable" is informed by Congressionally imposed timeframes and deadlines. In this case, Congress has clearly indicated, through the 2013 amendments to the Refugee Crisis in Iraq Act, that agency delay of more than nine months is unreasonable.

71.     Defendants have conspicuously failed to adjudicate Plaintiff's Application within a reasonable time.

72.     Plaintiff has brought this action because Plaintiff has no other means to compel Defendants to perform their duty owed to him.

73.     Defendants' unreasonable and unlawful delay in adjudicating Plaintiff's SIV Application has caused and continues to cause Plaintiff harm, including, without limitation, placing Plaintiff and Plaintiff's family under what Defendants—through the Chief of Mission in Iraq—have admitted to be a "serious threat" to life and well-being that is "a consequence of" Plaintiff's service to the United States.

74.     Plaintiff is entitled to a mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants to adjudicate his SIV Application forthwith.

## Count 2

### (5 U.S.C. § 706(1), Action to Compel Agency Action Unreasonably Delayed, against all Defendants)

75.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

76.     The APA, 5 U.S.C. § 555(b), obliges Defendants to adjudicate Plaintiff's SIV Application within a "reasonable time."

77.     The question of whether agency delay is "unreasonable" is informed by a number of factors, including, without limitation, the nine-month processing period set forth in the 2013 amendments to the Refugee Crisis in Iraq Act of 2007, and the mounting dangers Plaintiff faces as a consequence of his service to the United States.

78.     Defendants have conspicuously failed to adjudicate Plaintiff's Application within a reasonable time.

79.     Pursuant to the APA, 5 U.S.C. § 702, a person adversely affected by agency action is entitled to judicial review. Agency action includes a failure to act. 5 U.S.C. § 551(13).

80.     Defendants' unreasonable and unlawful delay in adjudicating Plaintiff's SIV Application has caused and continues to cause Plaintiff harm, including, without limitation, placing Plaintiff and Plaintiff's family under what Defendants admit to be "serious threat" to life and well-being that is a consequence of Plaintiff's service to the United States.

81.     The APA, 5 U.S.C. § 706(1), authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed."

82.     Plaintiff has brought this action because Plaintiff has no other means to compel Defendants to perform their duty owed to him.

83.     Plaintiff is entitled to relief pursuant to 5 U.S.C. § 706(1) compelling Defendants to adjudicate his SIV Application forthwith.

## VIII.  PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1) Issue a mandamus pursuant to 28 U.S.C. § 1361 directing Defendants to adjudicate Plaintiff's Application for a Special Immigrant Visa within fourteen (14) days from the issuance thereof;

2) Issue judgment pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), enjoining Defendants to adjudicate Plaintiff's Application for a Special Immigrant Visa within fourteen (14) days from the issuance thereof;

3) Retain jurisdiction over this action and any attendant proceedings until Defendants have actually adjudicated Plaintiff's Application for a Special Immigrant Visa and communicated the results of such adjudication to Plaintiff and the Court;

4) Award Plaintiff attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

5) Award Plaintiff such other relief as the Court may deem just and proper.

Dated: July 11, 2014
       Washington, D.C.

Respectfully submitted,

*Carlos Ramos- Mrosovsky*

Carlos Ramos-Mrosovsky
DC Bar No. 986363
FRESHFIELDS BRUCKHAUS
   DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
Tel: (212) 284 4936
carlos.ramos-mrosovsky@freshfields.com

Rebecca M. Heller
Motion for admission *pro hac vice* pending
IRAQI REFUGEE ASSISTANCE PROJECT
123 William Street, 16th Floor
New York, NY 10038
bheller@refugeerights.org

*Of Counsel*

*Attorneys for Plaintiff*